# UNITED STATES DISTRICT COURT
for the
Southern District of California

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* ) Case No. 21MJ1661
 )
A silver Google laptop model C0A, 8C05G06JP9 )
(Target Device 1) )
 )

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A-1.

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-1.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC sec. 856 | Maintaining a drug involved premises; Illegal gambling; and Conspiracy to |
| 18 USC sec. 1955, 371 | Maintain a Drug Involved Premises and to Operate an Illegal Gambling Business. |

The application is based on these facts:
See Attached Affidavit of FBI Special Agent Kari S. Harrison.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.*

*Kari S. Harrison*
Applicant's signature

Kari S. Harrison, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
___telephone___ *(specify reliable electronic means)*.

Date: 04/27/2021

*Barbara L. Major*
Judge's signature

City and state: San Diego, California    Hon. Barbara L. Major, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR WARRANTS TO SEARCH ELECTRONIC DEVICES

I, Kari S. Harrison, being duly sworn under oath, declare and state:

## EXPERIENCE AND TRAINING

1. I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. §§ 2510(7). As such, I am empowered to conduct investigations of, and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

2. I am a Special Agent with the Federal Bureau of Investigation and have been so employed since June of 2006. I am assigned to the San Diego Field Division on the Violent Crime Task Force-Gang Group (VCTF-GG). I have received basic federal law enforcement training, including the training at the FBI Academy, as well as other specialized federal law enforcement training. I have received formal training and have experience in narcotics investigations and gang investigations, including street gang investigations. I have participated in multiple separate investigations involving the distribution of controlled substances and firearms. As part of these investigations, I have used various investigative techniques, including physical and stationary surveillance, informants and cooperating sources, court authorized interceptions, pen register/trap and trace devices, telephone toll analysis, undercover operations, physical searches, mail covers, and electronic examinations of evidence. I have monitored numerous calls and meetings with persons under investigation, including wiretap communications of drug traffickers and gang members and associates. I have worked alongside and consulted with many law enforcement officials and other professionals experienced in drug and gang investigations.

3. Based on my training and experience, I am familiar with how drug traffickers and gang members communicate and operate. For example, I am aware that drug traffickers and gang members discuss and text criminal matters over the telephone and often use coded or vague language. I am aware of how drug traffickers and gang members use their phones to organize and operate their illegal activities. I am familiar with the typical make up and

operation of gangs and drug trafficking organizations including the distribution, storage, and transportation of the drugs, the collection of money which represents the proceeds of drug trafficking and other criminal activity, and money laundering.

4. I have also investigated illegal gambling dens in San Diego. I have become familiar with how illegal gambling dens are operated and utilize the sales and usage of controlled substances, primarily methamphetamine, in order to draw and maintain a customer base. I have also become familiar with the hierarchy of employees, how employees communicate through social media and phones, security measures such as surveillance, the presence of weapons including firearms, and crimes being committed inside these dens such as narcotic sales, robbery, extortion, identity theft, and fencing stolen property. I have participated in over five search warrants served at illegal gambling dens and interviewed patrons and suspects from these locations.  Further, I have participated in multiple investigations involving premises maintained for the purpose of distributing drugs.  As part of these investigations, I have used various investigative techniques including telephone toll analysis, social media analysis and electronic examinations of evidence.

5. The following is based my own investigation, oral and written reports by other law enforcement officers, physical surveillance, interviews, database and public records checks, searches, telephone toll analysis, and other investigation. Since this affidavit is for a limited purpose, I have not included every fact I know about this investigation. I set forth only facts necessary to establish foundation for the requested warrant. Conversations and discussions below are set forth in substance unless noted.

6. I submit that the facts contained herein demonstrate probable cause to believe that evidence of a crime; contraband, fruits of a crime, or other items illegally possessed; or property designed for use, intended for use, or used in committing a crime, specifically, violations of Title 21, United States Code, Section 856, (Maintaining a Drug Involved Premises); Title 18, United States Code, Section 1955, (Illegal Gambling); and Title 18, United States Code, Section 371 (Conspiracy to Maintain a Drug Involved Premises and

Illegal Gambling Business); as described in Attachments B-1 through B-5, will be found in the following electronic devices:

    a.    A silver Google laptop model C0A, 8C05G06JP9, seized from 5952 Dwight Street, San Diego, CA, and currently in FBI custody under case # 245D-SD-3034838, Evidence #1B313 **(Target Device 1);** and

    b.    A white and rose gold iPad tablet, model #A1550, SN# F9FY207LGHMQ, seized from 5952 Dwight Street, San Diego, CA, and currently in FBI custody under case # 245D-SD-3034838, Evidence #1B314 **(Target Device 2);** and

    c.    A pink and black Samsung foldable cellular telephone with unknown model # and IMEI # 353694850558647, seized from 5952 Dwight Street, San Diego, CA, and currently in FBI custody under case # 245D-SD-3034838, Evidence #1B315 **(Target Device 3);** and

    d.    A blue Motorola cellular telephone type MC36E, with IMEI # 351647110438531, seized from 5952 Dwight Street, San Diego, CA, and currently in FBI custody under case # 245D-SD-3034838, Evidence #1B316 **(Target Device 4);** and

    e.    A red camcorder with unknown model and unknown serial number, seized from 5952 Dwight Street, San Diego, CA, and currently in FBI custody under case # 245D-SD-3034838, Evidence #1B321 **(Target Device 5);**

(collectively, **Target Devices**) as described in Attachments A-1 through A-5 which are currently being held as evidence in the Southern District of California.

## PROBABLE CAUSE

*Background on San Diego's Illegal Gambling Dens*

7.    In 2013, SDPD Street Gang Unit Detectives observed a steady increase in the prevalence of illegal gambling dens. Investigators learned that Asian gang members and associates were often involved in operating these illegal gambling dens and that methamphetamine was being used and sold at these illegal gambling dens. These locations were known as a "trap" or "trap houses." The illegal gambling establishments were often

3

located inside houses, apartments, and outbuildings in residential neighborhoods predominantly in City Heights, in the East San Diego area. It is common for gambling den owners to pay rent in cash to the owners of these properties and, in some cases, a percentage of the profits to cast a blind eye to all the foot traffic.

8. In 2015, these locations began to draw more attention because of the frequency violent crimes occurring in and around them such as robberies, shootings, stabbings, and assaults. Investigators learned that the patrons were often gang members, career criminals, habitual drug users, and fugitives. Investigators believe that the criminal activity in and around these locations is due to these patrons.

9. Investigators are aware of approximately twenty-four active illegal gambling dens operating in San Diego County. The illegal gambling dens are equipped with electronic gambling machines which are programmed with several games of chance such as poker, blackjack, keno, jacks or better, and slot games. Most locations of these establishments are open 24 hours a day, seven days a week, with some shutting down in the early morning hours and starting up again in the afternoons. Investigators are aware that most of these locations are outfitted with exterior and interior video surveillance cameras, which are often monitored remotely by the establishment owners and managers. Those locations equipped with surveillance equipment often contain monitors showing live feed of the video surveillance.

10. Investigators learned that the owners will often not enter their own establishments but instead rely on trusted associates to open, operate and maintain the illegal gambling dens to reduce the likelihood that they will be identified by law enforcement. Investigators are also aware that the owners often rely on seemingly unrelated individuals to rent and obtain utilities for these establishments to further avoid detection by law enforcement. The illegal gambling establishments typically have a hierarchy of employees. The employees often include: doorman, banker, and money courier.

11. The doorman is generally an individual from the neighborhood who can recognize and screen patrons. Often, the doorman is a known gang member or a career criminal who has "respect" in the streets to deal with unwanted patrons, attempted robberies, and law enforcement. The doorman will also act as security or as an "enforcer" at the location by dealing with disputes, handling disturbances, monitoring the video surveillance, and reacting to law enforcement presence.

12. The "banker" carries the "bank roll," meaning the money to provide change and winnings to customers. There are generally one or two bankers working inside at any given time. The owners rely on trusted employees to conduct an "audit," which occurs at least twice in a twenty-four hour period. The audit is conducted by employees using a key to unlock and open gambling machines. The employees will retrieve the money from inside of the machines. It is a common practice for employees to photograph the master audit screen of each machine and share it with owners/managers. The master audit screen shows the cash in, cash out (winnings), and net gain/profit. Employees will clear the screen after each audit. The employees will also document the cash in, cash out, net gain, loans to customers, and other information in paper ledgers.

13. Owners may conduct several audits in a twenty-four hour period when the bank roll reaches a specified amount, such as $2,000. This is done to keep losses down from robbery and law enforcement seizures. In many cases, the employees will have all patrons step outside to conduct an audit to avoid being robbed. In some cases, the employees will conduct an audit with patrons inside but attempt to keep them at a distance. The gambling machines at these locations conservatively take in more than $3,000 a day.

14. Employees generally work a twelve-hour shift and make $50 - $250 per shift. At some locations, the owners will give a bonus based upon the amount of profit earned. Patrons tend to tip employees when they win jackpots, which are generally maxed at $1,000 - $1,200. The amount of time or tenure of employees varies. The current trend seems to be having one or two tenured employees and several short-term employees.

15. Many owners utilize a money courier. The money courier brings additional bank roll to employees, collects money from the audit, and brings profits to the owners. The money courier also acts as a manager who directs employee's actions and makes decisions on behalf of the owners at these locations.

16. Early investigative efforts revealed that one individual typically owned all of the gambling machines in a given illegal gambling den. Investigators have noted, however, an increase in locations where the gambling machines are owned by multiple individuals. Each of these owners receive a percentage of profit.

17. Investigators are aware that these illegal gambling dens are also drug involved premises. The main draw to illegal gambling establishments is methamphetamine use and sales. Investigators are aware, that other drugs are also known to be used and sold inside these establishments. It is rare to have a patron who does not use or sell methamphetamine inside these locations. The people selling drugs inside may be employees or independent drug dealers. It is common for employees to hand out small amounts of methamphetamine and "comp" customers who are playing. One owner described how he would give methamphetamine to patrons because it would draw them to the location and kept them playing on gambling machines.

18. In 2015, investigators executed numerous search warrants at illegal gambling dens in an effort to eliminate violent crimes associated with these establishments. These establishments are often robbed. The vast majority of these robberies were initially unreported to law enforcement. During search warrant executions at these locations, owners and patrons described drug use and sales inside these locations. However, due to enforcement operations, gambling den owners and employees have placed signs inside that say "no drug sales" or "no drugs." More recent enforcement operations have revealed that drug sales and drug use has not abated.

19. In the past two years, the number of violent crimes and property crimes in and around gambling den/drug premises has become more prevalent. From July 2018 through July 2020, there were over four hundred crime cases and over three hundred arrests within

150 feet of thirty-six illegal gambling locations investigated. The density of crime cases and arrests around these locations corresponds to the highest amount of crime in the East San Diego area. Law Enforcement has investigated homicides, shootings, stabbings, felony assaults, robberies, arson, auto thefts, burglaries, identity theft, firearm possession, drug sales/possession, and other crimes in and around these locations.

*Current Investigation*

20. The FBI Violent Crimes Task Force Gang Group is currently investigating Long TRAN, aka "Long Tu;" Le Thi LE, aka "Chi Le;" and Dong NGUYEN. TRAN and NGUYEN are known to affiliate with the Vietnamese Boys/V-Boys Street Gang in San Diego. Based on information gathered thus far in the investigation, TRAN, LE, and NGUYEN are involved in the operation of several illegal gambling dens where methamphetamine is being used and sold. The illegal gambling consists of electronic gambling machines with games of chance such as poker, keno, blackjack, and slots.

21. A criminal record check of TRAN revealed that he has prior felony convictions in California for conspiracy to operate a gambling den and drug premise and two convictions for burglary.

22. In December 2018, CS1[1] met with TRAN during a supervised and recorded law enforcement operation. TRAN described to CS1 how he operates illegal gambling dens where methamphetamine is used and sold. TRAN described how he had trusted employees who operate these locations by acting as doormen, security, the banker, those who audit the machines, and those who collect the money. TRAN described how he is never there, and his employees take the fall when police shut down a location. TRAN described at least

---

[1] CS1 has been a cooperating source of information for over two years. CS1 has criminal convictions for burglary and criminal threats that are more than 10 years old. CS1 was working under contract with the San Diego County District Attorney's Office since November 2019 to work off a pending theft case. Investigators have corroborated information provided by CS1 and have utilized CS1 to obtain search warrants, seize methamphetamine and firearms, and locate fugitives. Investigators believe CS1 to be credible and have not known CS1 to ever be untruthful or provide false information.

1 three different locations where he was operating a gambling den where drugs were being
2 used and proposed opening a new location with CS1.

3    23.   Between September 2018 and March 2019, SDPD investigators executed state
4 search warrants at five locations in San Diego. While executing these search warrants,
5 investigators recovered electronic gambling machines, cash, ledgers depicting audits and
6 cash flow, methamphetamine, drug paraphernalia, and electronic devices such as cellular
7 phones. Investigators interviewed patrons and suspects detained at each these search
8 warrant locations. Through these interviews, evidence recovered, follow-up search
9 warrants on cellular devices, and other evidence such as signage and ledgers, investigators
10 identified TRAN as the owner at each location. A male named Tung Nguyen, aka "Ang,"
11 was also identified as one of TRAN's employees who conducts audits, provides bankroll
12 money, and collects money from these locations. During the execution of the search
13 warrants, investigators seized gambling machines and the money inside them. The sum of
14 the money seized for each location exceeded $2000. Investigators were able to determine
15 that TRAN's organization involved more than five individuals who conducted, financed,
16 managed, supervised, directed and/or owned all or part of the illegal gambling businesses.

17    24.   On February 7, 2019, SDPD officers spoke to Tung NGUYEN in the alley
18 behind 3656 ½ 43rd Street. This location was being operated by TRAN, which was a
19 known gambling den where methamphetamine was being used and sold. Tung NGUYEN
20 had over $2,800 cash in his possession and was pending authorization from San Diego
21 County Probation to be arrested for a probation violation. Tung NGUYEN agreed to be
22 transported to a police station to be interviewed. SDPD investigators read Tung NGUYEN
23 his Miranda Rights, which he waived, and interviewed Tung NGUYEN. Tung NGUYEN
24 admitted to picking up money for TRAN from at least six different gambling dens where
25 methamphetamine was being used and sold. Tung NGUYEN described and showed how
26 he had communication with TRAN on Facebook Messenger regarding audits, collecting
27 money, and photographs of ledger pages.

25. On June 19, 2020, CS1 met with TRAN during a supervised and recorded law enforcement operation. TRAN discussed opening a gambling den with CS1. TRAN described the logistics including but not limited to start-up costs, supplying employees, conducting audits, collecting money, splitting the profits in half, and paying "Southsiders" (members of criminal street gangs) money for protection. TRAN described how he was operating three locations, one of which he referred to as the "coffee shop" and stated, "it was a good den." (Investigators believe that TRAN refers to 4776 El Cajon Boulevard #102, San Diego, CA as the "coffee shop" because it is next Café Le Le which serves Vietnamese coffee.) CS1 identified the "coffee shop" as 4776 El Cajon Boulevard #102, San Diego, CA.

26. On September 4, 2020, investigators interviewed Phonetip INTHAVONG, an Oriental Killer Boys gang member, after he was arrested by SDPD officers while in possession of one-half ounce of methamphetamine, a scale, cash, and a replica handgun. INTHAVONG agreed to speak with law enforcement after waiving his Miranda rights. INTHAVONG stated that he worked at the gambling den next to Café Le Le. Café Le Le is located at 4776 El Cajon Blvd Suite 101 (next to 4776 El Cajon Boulevard #102, San Diego, CA). INTHAVONG stated he was the doorman and made $120 or $150 a shift and worked a twelve-hour night shift. INTHAVONG stated that a lot of people smoke methamphetamine in the gambling den and there were over a dozen tabletop machines at the gambling den. INTHAVONG stated he did not sell drugs inside the gambling den, nor did he buy the drugs that were found on his person at the gambling den, rather he obtained the drugs from somewhere else. INTHAVONG noted that the gambling den operators take in a couple thousand dollars a day. Other employees in the gambling den include a banker and someone who cleans. The doorman is expected to do security. INTHAVONG provided he had worked at the gambling den for a week. INTHAVONG also provided he patronizes a gambling den across the street, 4258 ½ Euclid Avenue, San Diego, CA. INTAHVONG identified the owner of the gambling machines at 4258 ½ Euclid Avenue, San Diego, CA as Chi Le (Le Thi LE). INTHAVONG provided he was there two weeks prior to September

9

4, 2020, and people were "smoking dope" (using controlled substances) and gambling inside.

27. On August 25, 2020, the Honorable Bernard G. Skomal, United States Magistrate Judge, authorized a search of Long TRAN's Facebook account. On September 22, 2020, Facebook provided information from TRAN's account. Investigators reviewed the material provided by Facebook and found photos of the inside of a gambling den. Gambling machines were visible in the photos. These photos appear to be from surveillance cameras located inside 4776 El Cajon Boulevard #102, San Diego, CA. Investigators showed CS1 the photos and CS1 confirmed the photos were from the inside of 4776 El Cajon Boulevard #102, San Diego, CA.

28. A review of the Facebook records also revealed communications relating to 4776 El Cajon Boulevard #102, San Diego, CA:

> Na Na: "Long me and drowzy are here at euclid and we lost over a rack."
>
> TRAN: "Ok I tell nathan to give you some money back but lan might stop it ok. Tell her that you lost like a thousand. Because there is no percent back at coffee shop and lan is tripping."
>
> Na Na: "Ok thanks."

29. Investigators believe this message exchange indicates that a gambling patron, "NaNa," communicated to TRAN that she lost over a thousand dollars at the "coffee shop" and asked for some of the money back. TRAN thereafter agreed to return some of the money. TRAN's response also indicated that "Lan" (known by investigators to be Thanh Lan NGUYEN) may disagree that TRAN facilitated the return of money to "Nana" and may stop the money return. This message exchange demonstrates that TRAN has an ownership interest in 4776 El Cajon Boulevard #102, San Diego, CA in partnership with Thanh Lan NGUYEN.

30. On October 15, 2020, investigators executed a federal search warrant issued by the Honorable Linda Lopez and searched 4776 El Cajon Boulevard #102, San Diego, CA. During the search of the location, sixteen electronic gaming machines, a baggie of

10

narcotics, three methamphetamine pipes, documentation of dominion and control, $1707 in U.S. Currency found concealed under a pipe inside drywall, $50 in quarters in U.S. Currency, documentation of illegal gambling and $225 in U.S. Currency from the electronic gaming machines, were all found and seized.

31. On January 19, 2021, a Confidential Source (CS2)[2] reported the gambling den at 4776 El Cajon Boulevard #102, San Diego, CA had reopened sometime after the law enforcement search and was currently an active gambling den. CS2 provided the owner of the gambling machines at 4776 El Cajon Boulevard #102, San Diego, CA was Long TRAN and Thanh Lan NGUYEN. CS2 noted there were approximately fifteen gambling machines at this location.

*Seizure of Target Devices*

32. On April 14, 2021, investigators executed a federal search warrant issued by the Honorable Alison H. Goddard and searched 5952 Dwight Street, San Diego, CA 92105. During the search of the residence, three electronic gambling machines, multiple gambling machine parts, $59,814 in U.S. Currency, a laptop (**Target Device 1**), an iPad tablet (**Target Device 2**), two cell phones (**Target Device 3** and **Target Device 4**), a camcorder (**Target Device 5**), and miscellaneous documents were found and seized. **Target Device 1, Target Device 2, Target Device 3, Target Device 4,** and **Target Device 5** were located in the back structure in a living space where Long TRAN was residing.

33. On April 14, 2021, investigators executed a federal arrest warrant and TRAN was taken into custody. In a post-*Miranda* statement, LONG provided he lived at 5952 Dwight Street, San Diego, CA. LONG stated he fixes gambling machines, but that he does

---

[2] CS2 was reopened as an FBI confidential human source on January 11, 2021. CS2 had been administratively closed in 2011 after the completion of an investigation. CS2 has a felony conviction for possession of a controlled substance in 2007, a misdemeanor conviction for possession of a controlled substance in 2006, and a conviction for receiving stolen property in 2001. Investigators have corroborated information provided by CS2. Investigators believe CS2 to be credible and have not known CS2 to ever be untruthful or provide false information.

not run any gambling rooms anymore. LONG noted investigators would find money at his residence, but indicated the money was not his nor did he know whom the money belonged too.

BASIS FOR EVIDENCE SOUGHT IN SEARCH WARRANTS

34. Based upon my training and experience, consultation with other law enforcement officers experienced in illegal gambling den investigations, and all the facts and opinions set forth in this affidavit, I believe that probable cause exists that the **Target Devices** were used by TRAN and will contain electronic evidence of the target offenses described above.

35. In addition, I know that individuals engaged in illegal gambling dens and narcotics distribution often use their cell phones and electronic media to conspire, plan and coordinate their criminal activities and that cellphones and electronic media retain evidence of their crimes such as communications, photographs, videos, contact information of co-conspirators, location data, travel arrangements, media about the robberies they committed, research on how to successfully distribute narcotics and run an illegal gambling den, and financial data that evidence their narcotics and gambling activities, and usually maintain their cell phones on their person and/or their residence and vehicles.

36. I also know individuals engaged in the operation of illegal gambling dens utilize video surveillance cameras as a security measure and to monitor their business activities. These videos are often saved electronically onto hard drives inside DVR devices and in off-site electronic storage mediums commonly known as "clouds". DVR devices commonly contain video files, photograph files of saved screen shots, user information user/log-in information, historical data such as date and time, and other data. These videos and photographs can show individuals and their co-conspirators engaging in illegal gambling activity, money laundering, drug sales and use, and other criminal activity that occurs inside these locations.

//
//

PROCEDURES FOR ELECTRONICALLY STORED INFORMATION
ELECTRONIC DEVICES

37. It is not possible to determine, merely by knowing an electronic devices' make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Electronic devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many electronic devices like cellular telephones and iPads do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive. However, although manual review and digital photograph may be necessary, it is impractical because of the volume of data that may exist on a cellular phone and the manner in which that data may be displayed. For instance, manual review may require hundreds or even thousands of photographs to capture a conversation with a single other person.

38. Further, forensic data acquisition may allow for the recovery of data that is not visible to an agent manually reviewing the contents of an electronic device. For

instance, in some instances, forensic data acquisition involves creating an image of the entirety of the phone's/iPad's memory, including "unallocated" areas where deleted information may be stored. If unallocated space is successfully imaged, forensic reviewers may be able to access data that had previously been deleted. In those cases, deleted data recovered through forensic analysis would not be visible to an individual manually reviewing the contents of the phone, and therefore, could not be photographed during a manual review.

39. A cellular phone/iPad that is subject to forensic data acquisition can generally be returned to its user once data has been extracted without any indication that data has been extracted. Similarly, a phone/iPad that is not subject to forensic data acquisition can generally be manually reviewed returned to its user without any indication that it has been manually reviewed.

40. Following the issuance of this warrant, I will collect the **Target Devices** and subject the devices to analysis. All forensic analysis of the data contained within the device and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

41. A review of forensically extracted data or digital photographs taken during the manual review process for items subject to seizure may take weeks or months. The personnel conducting the analysis of that data will complete their analysis within ninety (90) days, absent further application to this court.

*Prior Attempts to Obtain Data*

42. The United States has not attempted to obtain this data by other means.

CONCLUSION

43. Based upon my training and experience, and the facts so far, there is probable cause to believe evidence of violations of Title 21, United States Code, Section 856, (Maintaining a Drug Involved Premises); Title 18, United States Code, Section 1955, (Illegal Gambling); and Title 18, United States Code, Section 371 (Conspiracy to Maintain a Drug Involved Premises and Illegal Gambling Business) will be found in the **Target**

**Telephone Devices** as described in Attachments A-1 through A-5. Therefore, I seek authorization to search them for evidence of those violations, as described in Attachments B-1 through B-5.

*Kari S. Harrison*
Kari S. Harrison
FBI Special Agent

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this <u>27th</u> day of April, 2021.

*Barbara L Major*
HON. BARBARA L. MAJOR
United States Magistrate Judge

15

# ATTACHMENT A-1
## DESCRIPTION OF PROPERTY TO BE SEARCHED

The property/item to be searched is described as:

A silver Google laptop model C0A, 8C05G06JP9, seized from 5952 Dwight Street, San Diego, CA, and currently in FBI custody under case # 245D-SD-3034838, Evidence #1B313 **(Target Device 1)**.

**Target Device 1** is currently in the possession of San Diego FBI and is being held as evidence in the Southern District of California.

# ATTACHMENT B-1
## ITEMS TO BE SEIZED

Authorization to search the laptop described in Attachment A-1, includes the search of disks, hard drives, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the laptop. The seizure and search of the laptop will be conducted in accordance with the affidavit submitted in support of the warrant.

The evidence to be seized from the laptop will be electronic records, communications, and data such as data files, emails, text messages, photographs, audio files, videos, and location data, for the period from **October 15, 2020 to and including April 14, 2021**:

a. Communications, writings, images, videos, records, and attachments tending to discuss or establish illegal gambling, controlled substance distribution, and controlled substance consumption;

b. Communications, writings, records, images and attachments tending to identify any co-conspirators involved in the activities above;

c. Communications, writings, records, images and attachments that demonstrate or corroborate the users of **Target Device 1**;

d. Tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the maintaining a drug involved premises and illegal gambling;

e. Tending to identify travel to or presence at locations related to drug involved premises and illegal gambling, including locations to obtain controlled substances and gambling machines;

f. Tending to identify the user of, or persons with control over or access to, the **Target Devices**;

g. Tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Section 856, (Maintaining a Drug Involved Premises); Title 18, United States Code, Section 1955, (Illegal Gambling); and Title 18, United States Code, Section 371 (Conspiracy to Maintain a Drug Involved Premises and Illegal Gambling Business).